IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

# LACEY A. MAINE v. WELLMONT HEALTH SYSTEM d/b/a BRISTOL REGIONAL MEDICAL CENTER, ET AL.

**Direct Appeal from the Law Court for Sullivan County**
**No. C10222(M)     John S. McLellan, III, Judge**

---

**No. E1999-00389-COA-R3-CV - Decided April 24, 2000**

---

In this medical malpractice action arising out of the plaintiff's surgery, the trial court granted the defendants summary judgment. The plaintiff appeals, contending that there are disputed material facts that make summary judgment inappropriate. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Law Court Affirmed; Case Remanded**

SUSANO, J., delivered the opinion of the court, in which GODDARD, P.J., and FRANKS, J., joined.

Thomas C. Jessee, Johnson City, Tennessee, for the appellant, Lacey A. Maine.

William T. Gamble and Russell W. Adkins, Kingsport, Tennessee, for the appellees Michael D. Rowell, M.D., D. Nelson Gwaltney, M.D., and Bristol Surgical Associates, P.C.

Charles T. "Chip" Herndon IV, Johnson City, Tennessee, for the appellees Stefan J. Grenvik, M.D., Richard M. Penny, M.D., and Bristol Anesthesia Services, P.C.

Jimmie C. Miller, Kingsport, Tennessee, for the appellees Wellmont Health System, d/b/a Bristol Regional Medical Center, Jerry Bullard, CRNA and Bob Herndon, CRNA.

## OPINION

### I. *Background*

The complaint named 11 health care providers as defendants. By agreement of the parties, two of the original defendants, radiologist William H. Johnstone, M.D. and his professional corporation, Radiology Associates - Bristol, P.C., were dismissed with prejudice from the litigation; therefore, their alleged liability will not be further noticed in this opinion. The following remaining defendants are charged with negligence in connection with the plaintiff's surgery: (1) general surgeons, Michael D. Rowell, M.D., and D. Nelson Gwaltney, M.D., and their professional corporation, Bristol Surgical Associates, P.C. ("Bristol Surgical Associates") (collectively "the

Surgical Defendants"); (2) anesthesiologists Stefan J. Grenvik, M.D. and Richard M. Penny, M.D. and their professional corporation, Bristol Anesthesia Services, P.C. (collectively "the Anesthesiology Defendants"); and (3) nurse anesthetists Jerry Bullard and Bob Herndon and their employer, Wellmont Health System d/b/a Bristol Regional Medical Center ("Bristol Regional") (collectively "the Nurse Anesthetist Defendants").

The trial court granted the remaining defendants summary judgment. The plaintiff raises as his sole issue on this appeal whether the trial court erred in finding that there are no genuine issues of material fact and in finding that the defendants are entitled to judgment as a matter of law.

II. *Facts*

On February 17, 1996, Maine experienced severe pain in both legs after a vigorous three-hour workout on an exercise bicycle. He visited the emergency room at Bristol Regional and was examined by Dr. Gwaltney, the emergency room physician on call. Maine, a very obese man, related to Dr. Gwaltney a history of diabetes and the fact that he smoked at least one pack of cigarettes a day. Dr. Gwaltney admitted Maine to the hospital and treated him for an obstruction of blood flow to his left leg.

Maine was referred to radiologist Dr. Johnstone for the performance of diagnostic tests. Based upon the results of these tests, an angioplasty was performed in an attempt to clear the obstruction. Dr. Johnstone testified by affidavit that the procedure was terminated when a follow-up test showed re-obstruction at the same location.

Dr. Rowell first became involved in Maine's care on February 22, 1996. He reviewed Maine's medical records and noted that Maine was experiencing some pain even at rest. Dr. Rowell discussed continued conservative management and the associated risks, including the possibility of limb loss, with Maine, his wife, and his brother, Dr. Charles Maine. All three agreed to proceed with surgery on Maine's left leg.

Maine underwent surgery at Bristol Regional on February 23, 1996. Anesthesiologist Dr. Grenvik, with the assistance of nurse anesthetist Bullard, initiated the anesthesia. During the surgery, Dr. Grenvik was relieved by fellow anesthesiologist Dr. Penny, and Bullard was relieved by fellow nurse anesthetist Herndon.

Dr. Rowell performed the surgery. He performed (1) a left above-the-knee popliteal[1] artery to below-the-knee popliteal artery bypass, and (2) a left below-the-knee popliteal artery embolectomy.[2]

---

[1] "Popliteal" refers to the posterior surface of the knee.

[2] An "embolectomy" is the surgical removal of a clot or other plug from a blood vessel.

-2-

The surgery lasted over seven and a half hours. The surgery was technically challenging due to the size of Maine's left leg and the need to do certain intraoperative procedures.

After the surgery, Dr. Rowell met with Maine's wife at about 10:30 P.M. to discuss the surgery with her. When Mrs. Maine saw her husband at 11:00 P.M., she discovered that he had a moderate speech impediment -- "stuttering" -- and a knot on his head. Dr. Rowell ordered a CT scan on February 29, 1996, which was performed on the same day. The scan revealed no evidence of trauma.

On February 21, 1997, Maine filed a *pro se*[3] complaint against the various defendants alleging medical malpractice. The complaint charges that the defendants breached their respective standards of care and that his injuries -- mental dysfunction, speech impediment, modified personality, inability to work, and permanent injury to his left leg -- ordinarily do not occur in the absence of negligence. In addition, the complaint alleges that the defendants did not warn him that injuries of this type were risks of the surgical procedure. All of the defendants filed motions and the trial court considered the various affidavits filed by both sides as well as the deposition of Dr. Rowell. The court found that all of the defendants are entitled to summary judgment.

### III. *Medical Malpractice Law*

Medical malpractice actions in Tennessee are governed by T.C.A. § 29-26-115 (1980), which provides, in pertinent part, as follows:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
>
> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless

---

[3]At a subsequent time, the plaintiff retained counsel to represent him at the trial level.

he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

(c) In a malpractice action as described in subsection (a) of this section there shall be no presumption of negligence on the part of the defendant. Provided, however, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

With respect to a complaint alleging lack of informed consent, T.C.A. § 29-26-118 (1980) provides that

[i]n a malpractice action, the plaintiff shall prove by evidence as required by § 29-26-115(b) that the defendant did not supply appropriate information to the patient in obtaining his informed consent (to the procedure out of which plaintiff's claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which he practices and in similar communities.

In an informed consent case, a plaintiff must establish, by expert testimony, that "the information provided to the patient deviated from the usual and customary information given to patients to procure consent in similar situations." ***Blanchard v. Kellum***, 975 S.W.2d 522, 524 (Tenn. 1998). "The inquiry focuses on whether the doctor provided *any* or *adequate* information to allow a patient to formulate an intelligent and informed decision when authorizing or consenting to a procedure." ***Id***. (emphasis in ***Blanchard***).

IV. *Summary Judgment*

We now turn our attention to the subject of summary judgment. In deciding whether a grant of summary judgment is appropriate, courts are to determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Rule 56.04, Tenn.R.Civ.P. Courts "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." **Byrd v. Hall**, 847 S.W.2d 208, 210-211 (Tenn. 1993).

The party seeking summary judgment has the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. **Id**. at 215. Generally, a defendant seeking summary judgment may meet this burden in one of two ways: (1) by affirmatively negating an essential element of the plaintiff's cause of action, or (2) by conclusively establishing an affirmative defense. **Id**. at 215 n. 5. "A conclusory assertion that the nonmoving party has no evidence is clearly insufficient." **Id**. at 215.

Once the moving party satisfies its burden of showing that there is no genuine issue of material fact, the burden then shifts to the nonmoving party to show that there is a genuine issue of material fact requiring submission to the trier of fact. **Id**. The nonmoving party cannot simply rely upon its pleadings, but rather must set forth, by affidavits or discovery materials, specific facts showing a genuine issue of material fact for trial. Rule 56.06, Tenn.R.Civ.P.; **Byrd**, 847 S.W.2d at 215. The evidence offered by the nonmoving party must be admissible at trial but need not be in admissible form. It must be taken as true. **Byrd**, 847 S.W.2d at 215-216.

Therefore, summary judgment for the defendants in this action is appropriate if the defendants produced expert testimony completely refuting Maine's allegations of negligence and/or causation and Maine failed to effectively rebut the defendants' proof. See **Kennedy v. Holder**, 1 S.W.3d 670, 672 (Tenn.Ct.App. 1999).

## V. *Analysis*

We must now determine whether the various defendants have carried their burden on summary judgment of showing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

The Nurse Anesthetist Defendants' motion for summary judgment is supported by the affidavits of Bullard and Herndon. These affidavits establish that both Bullard and Herndon have practiced as Certified Registered Nurse Anesthetists ("CRNAs") in Bristol since 1982 and 1988 respectively. Both state that they are "knowledgeable of the standard of care required of CRNAs providing anesthesia [sic] care to surgical patients in Bristol, Tennessee." Both affirmatively state that the medications given to Maine conformed to the applicable standard of care, and both assert that any speech irregularities suffered by Maine are not the result of any negligent act or omission by them.

The Anesthesiology Defendants' motion for summary judgment is supported by the affidavits of Drs. Grenvik and Penny. These affidavits establish that both Dr. Grenvik and Dr. Penny are Tennessee-licensed anesthesiologists and have been in the private practice of anesthesiology in Bristol since at least 1993. Both state that they are familiar with the standard of care for physicians

practicing in the specialty of anesthesiology in Bristol. Both affirmatively state that they adhered to the relevant standard of care and did not deviate therefrom. Both state that there were no complications during the administration of anesthesia, and that their care and treatment did not proximately cause any harm or damage to Maine. In addition, Dr. Grenvik states in his affidavit that a member of his group apprised Maine of the general nature and normal risks of anesthesia and documented this fact on Maine's chart. Dr. Grenvik further states that he himself apprised Maine of the normal risks of anesthesia on the morning before the surgery.

The motions for summary judgment filed by Dr. Rowell, Dr. Gwaltney, and Bristol Surgical Associates are supported by the affidavit of Dr. Gwaltney and the affidavit and deposition of Dr. Rowell. The affidavits show that Dr. Rowell practices general surgery and has been licensed to practice in Tennessee since 1991 and that Dr. Gwaltney has been a licensed, practicing general and vascular surgeon in Bristol since 1984. Both surgeons are "familiar with the standard of care as it relates to the practice of general surgery in Bristol...." Both doctors' affidavits describe in detail their interaction and treatment of Maine, and both assert that they have no knowledge of any trauma to Maine's head during the surgery. Dr. Rowell specifically states that he discussed the associated risks with Maine and his wife, including the possibility of limb loss. He further states that Maine did not wake up during his surgery. Dr. Rowell also states that the "length of the operation was necessitated by the need to do an intraoperative angiogram, and an intraoperative thrombectomy of all three tibial vessels." Both surgeons state in their affidavits that they acted in accordance with the relevant standard of care at all material times and assert that there is no causal connection between their treatment of Maine and the injuries and conditions alleged in the complaint. Dr. Rowell's deposition reiterates the statements made in his affidavit.

We find that all of the defendants effectively carried their respective burdens on summary judgment of bringing forth facts sufficient to establish -- if left uncontradicted -- that there are no genuine issues of material fact and that they are entitled to a judgment as a matter of law. Each affiant qualifies as an expert under T.C.A. § 29-26-115(b). Each affidavit establishes that the affiant knows the recognized standard of acceptable professional practice in his or her profession or specialty, that they acted in accordance with these standards, and that their conduct did not proximately cause any of Maine's alleged injuries. Therefore, we find that all of the defendants effectively shifted the burden to Maine to show that there is indeed a genuine issue of material fact rendering summary judgment inappropriate.

Mrs. Maine's affidavit makes the following assertions: (1) Dr. Gwaltney expressed to her, a few days prior to the surgery, that her husband would not be able to tolerate surgery because of his age and the likely results; (2) Maine was not informed of the risks of anesthesia; (3) Maine was not told that the conditions that Maine is currently experiencing were risks of the surgery; (4) upon asking a nurse -- otherwise unidentified -- subsequent to the surgery about the bump on Maine's head, the nurse stated that Maine had awoken during surgery; (5) in attempting to explain the bump on Maine's head, Dr. Rowell suggested that perhaps he was hit by a piece of machinery by someone in radiology during the surgery; (6) in attempting to explain Maine's speech impediment, Dr. Rowell first stated that it was a temporary side effect of the drugs, and later

speculated that it could have been caused by the anesthesia; and (7) upon review of Maine's medical record, Mrs. Maine could find nothing to indicate that Maine had woken up during surgery or that his head had been hit.

Maine also submitted the affidavit of his physician brother, Dr. Charles Maine. Dr. Maine's affidavit states that he is "currently a physician licensed to practice medicine in the State of Virginia." His current practice is located within 50 miles of Bristol, and he has been licensed "at all times relevant to this proceeding." It is his opinion that not explaining the risks associated with general anesthesia is a violation of the standard of care. He also states that if his brother woke up during surgery, this fact should have been noted in the medical records and that failing to do so constitutes a breach of the standard of care. Significantly, he opines that "without additional information from all persons present, a medical expert is incapable of determining what exactly occurred."

Maine argues that the affidavits of his wife and brother "raise issues relating to why the plaintiff had a large knot on his head when he came out of surgery, why the surgery took so long, why he went in with problems in his leg and came out having a speech impediment and a loss of mental faculties, and whether the standard of care was met as concerns informed consent."

There is no indication in Mrs. Maine's affidavit that her assertions with respect to what Maine was or was not told by the defendants concerning the risks of the anesthesia and the surgery are based entirely on firsthand information. Obviously, she would only have personal knowledge of what Maine was told in her presence. Her affidavit does not establish that she was present during *all* of the times that the various physicians were with Maine and had an opportunity to address the nature and risks of his surgery. It follows that she does not know, and therefore cannot establish by her own affidavit, what he was told in her absence. Hence, her affidavit does not establish a genuine issue of material fact as to whether the defendants conveyed the necessary information to Maine with respect to the nature of, and the risks attendant to, the anesthesia and his surgery.

Mrs. Maine's assertion that "a nurse" informed her that Maine woke up during surgery is likewise inadmissible because, among other things, it is hearsay. It is true that the hearsay rule does not apply to "a statement by an agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship under circumstances qualifying the statement as one against the declarant's interest regardless of declarant's availability...." Tenn. R. Evid. 803(1.2)(D). However, in order to qualify under this exception, "the statement (1) must concern a matter within the scope of the declarant's agency or employment; (2) must have been made while the agency or employment relationship existed; and (3) must be against the declarant's interest when made." *Dailey v. Bateman*, 937 S.W.2d 927, 930 (Tenn.Ct.App. 1996). Here, in addition to the nurse's identity being unknown, there is nothing in the record to indicate the source of the nurse's information and nothing to indicate that the nurse's statement was against his or her personal interest. We do not know from the affidavit whether the "nurse" was in the operating room during the surgery or otherwise a part of Maine's care. Therefore, the information supplied

by "a nurse" is inadmissible to prove that Maine woke up during surgery, *see id*. at 930-31, and cannot be considered by us on summary judgment.

The remaining statements in Mrs. Maine's affidavit concerning Dr. Rowell's attempts to explain Maine's stuttering and the bump on his head are speculative statements of the physician and do not establish anything other than that Dr. Rowell did not have an explanation for these conditions. Finally, the fact that Maine's medical records contain nothing indicating that he woke up during surgery or that he was hit in the head during surgery work against Maine because they tend to establish that nothing of this nature occurred.

Dr. Maine's affidavit does no better. Initially, it is unclear whether he would qualify under T.C.A. § 29-26-115(b) as an expert regarding the various specialties of the defendants. Even assuming *arguendo* that his testimony would be admissible as to the issues in this litigation, his statements do not make out a case against the defendants. He states that not explaining the risks associated with general anesthesia is a violation of the standard of care, but, as we have just noted, Maine has not established that the defendants neglected to explain the risks to him. Similarly, neglecting to note in the medical records that Maine woke up during surgery cannot be a breach of the standard of care if Maine did not, in fact, wake up during surgery. As previously noted, there is no admissible evidence before us to the effect that he did wake up while the surgery was ongoing. The most damaging statement to the plaintiff in Dr. Maine's affidavit is that "without additional information from all persons present, a medical expert is incapable of determining what exactly occurred." If one cannot determine what occurred, one cannot adequately opine that any standard of care was breached or that such a breach proximately caused injury.

We recognize that T.C.A. § 29-26-115(c) allows a plaintiff to utilize *res ipsa loquitur* to establish a rebuttable presumption of a defendant's negligence in certain circumstances. *See, e.g., Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 96 (Tenn. 1999). In order to establish such a presumption, however, a plaintiff must "demonstrate that he or she was injured by an instrumentality that was within the defendant's exclusive control and that the injury would not ordinarily have occurred in the absence of negligence." *Id*. at 91. In medical malpractice cases, the second prong of this test must be established by expert testimony unless the alleged malpractice lies within the common knowledge of lay persons. *Id*. at 92.

We find and hold that Maine has not established the first prong of the *res ipsa loquitur* test, *i.e.*, that he was injured by an instrumentality under the exclusive control of the defendants. Two of our prior cases are particularly instructive on this point. In *Meadows v. Patterson*, 109 S.W.2d 417 (Tenn.Ct.App. 1937), the plaintiff's eye was alleged to have been injured while he was under the influence of anesthesia for an appendectomy. *Id*. at 418. After the surgery, the plaintiff, still unconscious, was taken to a private room in the hospital and was left in the care of a nurse for the night. *Id*. at 419. We held in that case that the plaintiff failed to establish the prerequisite to the application of *res ipsa loquitur*, *i.e.*, that the injury occurred while the plaintiff was under the defendant surgeon's control. *Id*. at 420. We stated that submitting the case to a jury under such facts "would have permitted the jury to speculate as to whether the injury occurred in the

-8-

operating room where, as we have seen, plaintiff was under the control of defendant, whether it occurred in transit from the operating room to plaintiff's private room, or occurred after he was left in the custody of the nurse." *Id*. at 420.

We held similarly in ***Jones v. Golden***, C/A No. 03A01-9108-CV-269, 1991 WL 238275 (Tenn.Ct.App. E.S., filed November 18, 1991). In ***Jones***, the plaintiff underwent surgery for removal of a cyst on his left wrist. *Id*. at *1. Though the surgery was performed without incident, the plaintiff discovered, sometime after the surgery and while in his hospital room, that he had a small blister just above his elbow on the inner side of his left arm. *Id*. The trial court granted summary judgment for the defendants, finding that "[t]here is no proof as to whether the injury occurred during surgery, in the recovery room, or elsewhere." *Id*. at *2. We affirmed "because the record support[ed] the findings of the trial court." *Id*.

The facts of the instant case are strikingly similar to the facts in ***Meadows*** and ***Jones***. Dr. Rowell states in his affidavit that the surgery was completed at 8:20 P.M. Mrs. Maine states that Dr. Rowell discussed the surgery with her at some unspecified location at 10:30 P.M. and that she then saw her husband at approximately 11:00 P.M. Thus, Maine's surgery was completed at least thirty minutes, possibly as long as two hours and forty minutes, before Mrs. Maine saw him and noticed his condition. There is nothing in Mrs. Maine's affidavit indicating whether she saw her husband in a recovery room, thus indicating that Maine was still under the control of some or all of the defendants, or whether he was in a private room, or exactly where he was. There is nothing in the record to indicate when Maine regained consciousness after the surgery. A reasonable inference to be drawn from the fact that he was stuttering at 11:00 P.M. is that he was conscious at that time. He may have been conscious in his own private room for a period of time after the surgery but prior to seeing his wife at 11:00 P.M. Thus, we cannot say that the evidence shows that Maine sustained the bump on his head while he was within the exclusive control of the defendants or any one of them.

In any event, it is important to recognize that the bump on Maine's head is not the real injury of which he complains. In fact, the bump is not even mentioned in his complaint. As we understand the plaintiff's complaint, he is not seeking damages for a bump on the head. Rather, his complaint seeks compensatory damages based on a number of other alleged injuries and conditions. According to the complaint, Maine "is now totally unable to provide income for his family, has a permanent injury to his leg, has a speech impediment, limited concentration, and [a] changed personality." He is concerned with the bump on his head only as it serves as circumstantial evidence that his real injuries, or some of them, are attributable to the defendants' negligence.

Even if the affidavits filed by Maine made out a case of negligence as to the bump on his head under the theory of *res ipsa loquitur*, his evidence would still be deficient as to his apparent theory that some of his injuries are related to that bump. It goes without saying that a causal relationship between a bump on the head and stuttering or a changed personality is not something that is within the common knowledge of lay persons. This causal connection requires expert testimony. *See **Coyle v. Prieto**,* 822 S.W.2d 596, 598 (Tenn.Ct.App. 1991). The only expert

testimony offered by Maine is in the form of his brother's affidavit, which in no way asserts that Maine's current injuries are a result of being hit in the head or that they are otherwise associated with the bump.  Therefore, even if Maine had established that he was hit in the head while under the exclusive control of the defendants -- and we have held that he did not -- there is no showing of a nexus between the cause of the bump and his real injuries.  In the final analysis, we find that the record before us does not contain *any* evidence that the injuries and conditions alleged in the complaint were proximately caused by the negligence of any of the defendants.  In the absence of such proof, the defendants' affidavits -- denying that anything they did or failed to do caused Maine's injuries -- carry the day.  Consequently, the defendants are entitled to summary judgment.

## VI. *Conclusion*

The judgment of the trial court is affirmed.  This case is remanded to the trial court for collection of costs assessed there, pursuant to applicable law.  Costs on appeal are taxed to the appellant.